Marilyn Heiken, OSB #923308
mheiken@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLESTON, PC
975 Oak Street, Suite 1050
Eugene, OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882

*Attorneys for Plaintiff and the Proposed Class*
*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| IAN REYNOLDS, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>KALSHI INC., KALSHIEX LLC, KALSHI KLEAR INC., KALSHI KLEAR LLC, KALSHI TRADING LLC, SUSQUEHANNA INTERNATIONAL GROUP, LLP, AND SUSQUEHANNA GOVERNMENT PRODUCTS, LLLP,<br><br>Defendants. | Case No. 3:26-cv-00336<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **DECLARATORY JUDGMENT;**<br><br>2. **VIOLATION OF OREGON GAMBLING LOSS RECOVERY STATUTE (ORS 30.740,** *et seq.***); and**<br><br>3. **VIOLATION OF OREGON UNLAWFUL TRADE PRACTICES ACT (ORS 646.605,** *et seq.***)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ian Reynolds, by and through the undersigned counsel, brings this action against

Defendants Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Trading LLC,

Susquehanna International Group, LLP, and Susquehanna Government Products, LLLP (together,

"Kalshi" or "Defendants") for running an illegal online gambling enterprise in violation of Oregon

law, and alleges as follows:

## INTRODUCTION

1.      Kalshi owns and operates an online platform accessible at its website and mobile app (the "Kalshi Platform") that markets "event contracts" but, in practice, functions as an online sportsbook offering sports betting. Through the Kalshi Platform, Oregon residents fund accounts with real money, place wagers on the outcomes of sporting events by buying "Yes" or "No" positions, and receive cash payouts when their wagers win. In substance, it is simple: deposit money → bet on a sports outcome → win/lose → withdraw cash. In practice, users are typically wagering against Kalshi itself or its affiliated and institutional market-making counterparties, which stand ready to take the opposite side of public wagers as a business. Kalshi grants these counterparties financial incentives, fee discounts, and technological trading advantages that are not available to ordinary retail users.

2.      Kalshi attempts to evade Oregon's gambling laws by recasting sports wagers as federally regulated "derivatives" traded on a so-called "prediction market." Kalshi asserts that users are not betting on sporting events, but are instead buying and selling what Kalshi calls "futures", "swaps", or "options" on event outcomes—a characterization aimed at regulators and courts, not ordinary users. In reality, the derivatives framing is commercially illusory: users pay real money, select a side of a sporting event, and either lose their stake or receive a fixed cash payout based entirely on the win-loss result of the game. Kalshi monetizes this sports-wagering activity by charging transaction fees tied to user bets and by structuring the Platform to generate revenue from wagering volume. The "prediction market" structure is a pretext designed to disguise sports betting as financial trading. In substance and effect, Kalshi operates an unlicensed online sportsbook in Oregon, in violation of Oregon law. Plaintiff brings this action under Oregon's Gambling Loss Recovery Statute, which permits recovery of twice the amount lost.

3.      This action is brought by Plaintiff and a class of all persons who, while located in Oregon, paid money or other things of value to wager on sporting events on the Kalshi Platform (the "Class"). They seek declaratory and injunctive relief and damages against Kalshi for evading Oregon gaming laws by offering illegal, unconstitutional, unregulated, and untaxed sports betting on its mobile app and website throughout the State of Oregon.

4.      Gambling causes many social and familial harms, including "financial stress, relationship breakdown, family violence, mental illness and suicide."[1] Even more, "[t]he legacy of gambling harm can endure throughout one's life and transmit intergenerationally."[2]

5.      Sports betting in particular is appealing, and in many cases targeted, to minors and young adults.[3]

6.      Kalshi is no different, and in fact permits, encourages, and profits from users under the age of 21 wagering on sports events, including the ultimate win/loss outcome and secondary outcomes such as the number of points scored (i.e., prop bets).[4]

7.      To protect its residents from these harms, Oregon outlaws all non-state-run gambling-related activities within its borders.

8.      As a result, the only lawful form of gambling permitted in Oregon is through the Oregon Lottery, which is strictly regulated to ensure oversight and compliance with Oregon's policies.

---

[1] https://www.who.int/news-room/fact-sheets/detail/gambling

[2] *Id.*

[3] https://www.cbc.ca/news/health/youth-sports-betting-advertisements-enticing-doctors-1.7627752

[4] https://gamblingharm.org/kalshi-college-ambassadors-program/

9. Beginning in January 2022, DraftKings entered into an exclusive partnership with the Oregon Lottery, making it the sole legal provider of online sports betting for individuals residing in Oregon.[5]

10. However, even with this partnership in place, Oregon continues to prohibit sports betting on youth and collegiate games and bans all sports wagering conducted through sportsbooks other than the Oregon Lottery's authorized DraftKings platform.[6]

11. Kalshi nevertheless operates as if it is above Oregon law.

12. Specifically, Kalshi operates a purported "prediction market" in Oregon whereby residents can buy and sell so-called "event contracts" tied to, among other things, sports outcomes.

13. Kalshi has not obtained any Oregon gambling or sports-betting authorization or license to offer sports wagering in Oregon. Instead, it operates outside Oregon's regulatory framework, without complying with Oregon gaming oversight, taxation, or licensing requirements.

14. Although Kalshi tells courts and regulators that it offers unique securities or commodities purportedly regulated by the CFTC, Kalshi's self-described "event contracts" are thinly veiled gambling wagers based on the outcome of specific future events—e.g., whether a particular team will win or lose a particular game. The images below from Kalshi about wagering on the College Football Championship reflect the reality that these are sports wagers: a user may select "Yes" on Indiana to win and pay the displayed contract price (e.g., 74¢ per contract), which pays $1 if Indiana wins the game and $0 if it does not. In other words, the user risks 74¢ for the chance to win $1 based entirely on the outcome of the game.

---

[5] https://www.oregonlottery.org/sports/draftkings-qa/

[6] *Id*.





15.    Not only can Oregon residents bet on who will win the game, but Kalshi also provides other traditional sports gambling offerings, such as the outcomes of point spreads (e.g., Houston wins by over 2.5 points), total combined points (e.g., over 39.5 combined points), and player proposition bets ("props") such as whether a specific player will score a touchdown. As reflected below, each such wager is structured as a "Yes" or "No" position that pays a fixed $1 per contract if the specified game result is achieved and $0 if it is not.



16.    In an effort to avoid gambling regulations and licensing requirements, Kalshi characterizes these sports wagers as "futures," "swaps" or "options" "contracts" as if they were financial hedging instruments rather than sports bets. Courts across the country have rejected Kalshi's semantic wordplay.[7]

17.    Indeed, many courts have issued injunctions prohibiting Kalshi from offering these so-called sports-based "contracts" within their jurisdictions.

---

[7] *See, e.g.*, *KalshiEx, LLC v. Hendrick*, Case No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 234246, at *27 (D. Nev. Nov. 24, 2025) ("These are sports wagers and everyone who sees them knows it. That includes Kalshi, who has advertised itself as the 'first app for legal sports betting in all 50 states.'"); *Commonwealth v. KalshiEX, LLC*, Case No. 2584CV02525, 2026 Mass. Super. LEXIS 2, at *21 (Suffolk County Superior Court Jan. 20, 2026) ("There can be little question that Kalshi well understood that its business model—especially once it began offering bets on sporting events—came into direct conflict [with] state enforcement regimes; Kalshi chose to take that risk head-on.").

18.     Plaintiff and Class members regularly wagered large sums of money on the Kalshi Platform based on Kalshi's misrepresentation that its sports wagering was and is legal in Oregon.

19.     Kalshi has operated in Oregon since 2023. In October 2025, Kalshi's annualized wager volume hit $50 billion (up from $300 million for 2024), mostly by offering illegal, unregulated, and untaxed sports betting, including in Oregon. Each day that Kalshi continues to operate in violation of Oregon law injures the State and its residents, including Plaintiff and members of the Class.

20.     Because Kalshi offers participants the opportunity to receive a cash payout only by risking money or other things of value on the outcome of sporting events—games of chance—the Kalshi Platform constitutes illegal gambling under Oregon law.

21.     Plaintiff and Class members each wagered and lost money or other things of value on the Kalshi Platform. Through this action, Plaintiff seeks to enforce Oregon's strong, constitutional prohibition against sports gambling by permanently enjoining Kalshi from offering its services in Oregon and seeking damages under Oregon's Loss Recovery Statute. In addition, Kalshi engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Oregon, including representing and causing Plaintiff and Class members to believe that sports wagering on the Kalshi Platform was legal, authorized, or regulated in Oregon, when in fact it constitutes unlawful gambling under Oregon law.

## JURISDICTION AND VENUE

22.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000 and Plaintiff and at least one Class member are citizens of a different state than Defendants.

23.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are deemed to reside in any district where they are subject to personal jurisdiction. Plaintiff wagered money or other things of value on Kalshi in this District, and Defendants marketed, advertised, and accepted wagers here. Thus, a substantial portion of the events giving rise to the claims occurred within this District.

24.    The Court also has personal jurisdiction over Defendants because Defendants do substantial business and transactions in Oregon, Plaintiff's claims arise from those Oregon contacts, and it would not offend traditional notions of fair play and substantial justice for Defendants to defend themselves in Oregon.

25.    More specifically, Kalshi operates a highly interactive website within the State of Oregon.

26.    Kalshi.com operates continuously and is designed to generate substantial revenue for Defendants year after year.

27.    Unlike passive websites, Kalshi.com requires users to create accounts, allows and encourages users to engage in gambling (including sports betting), and invites users to contact Kalshi directly through the website.

28.    Through this process, Defendants seek to form contracts with Oregon residents, including Plaintiff, and transact with Oregon residents, including Plaintiff.

29.    Kalshi actively advertises and solicits Oregon residents to create accounts and participate in gambling on Kalshi's website and mobile App.

30.    Kalshi uses geo-targeted digital advertisements, banner ads, search-engine optimization efforts aimed at increasing visibility on search engine results pages, and direct email outreach.

31.     Kalshi enables continuous commercial interactions between Oregon residents and Kalshi by tracking their geographic location using tools such as GPS, Wi-Fi, wireless network triangulation, transaction location, and IP addresses.

32.     This information is used to "tailor [Kalshi's] product offerings" and provide each Oregon resident a more "personalized and enhanced user experience."[8]

33.     Kalshi also uses these tracking technologies to measure the effectiveness of its marketing efforts and provide "advertisements based on your interests and activities on [Kalshi.]"[9]

34.     These activities and advertisements serve one purpose: to reach into Oregon and encourage Oregon residents to register accounts and engage in online gambling activities for Defendants' profit.

35.     Once Oregon residents complete the registration process, Kalshi contacts Oregon residents directly to, among other things, answer questions or comments, deliver newsletters, make suggestions and recommendations based on your captures data, and respond to users who have contacted Kalshi regarding employment opportunities.

36.     Importantly, Kalshi will also directly contact users who owe money on the website.[10] This active collection places Kalshi in the position of initiating financial contact within the state rather than merely operating a passive online platform. Kalshi's conduct is akin to how a traditional bookmaker pursues bettors to collect winnings or settle accounts. Accordingly, Kalshi's conduct moves its contacts with Oregon beyond passive facilitation and into a realm of purposeful, targeted financial interaction with Oregon residents.

---

[8] https://kalshi.com/privacy-policy (last visited Jan. 28, 2026); *see also* Ex. 1.

[9] *Id.*

[10] *Id.*

37.     Kalshi also knowingly accepts payments from Oregon bank accounts and debit/credit cards for the purchase of virtual coins, which users, including Plaintiff, then use to place wagers on the Kalshi.com.

38.     Kalshi operates for the benefit of all Defendants, who are affiliated and together operate solely to derive substantial revenue from their continuous and systematic contacts with Oregon.

39.     Kalshi also obtains user information from third parties, like Google and Facebook to track users' "to tailor [Kalshi's] advertisements and content to you."[11]

40.     Kalshi also operates as a market maker, where it will transact and attempt to contract with Oregon residents on certain sporting events, profiting from those purported contracts and transactions.

41.     Not only did Defendant Susquehanna benefit from Kalshi's substantial contacts with Oregon, but it, acting as a market maker, attempted contract directly with Oregon residents on certain wagers, and profited from those purported contracts and transactions.

42.     Throughout the relevant time period, Defendants systematically conducted and continue to conduct business in Oregon.

43.     It was foreseeable, and intended, that Oregon residents would use Kalshi.com, as Defendants were well aware that Oregon customers regularly participated in online gambling through the website.

44.     Defendants profit substantially from Oregon users, who make up a significant portion of their customer base.

---

[11] *Id.*

45.    Defendants reached into Oregon, advertised in Oregon, invited Oregon residents to participate in gambling on Kalshi.com, and transacted with Oregon residents. By doing so, Defendants purposefully availed themselves of the privilege of conducting business in Oregon.

**PARTIES**

*Plaintiff*

46.    Plaintiff Ian Reynolds is an Oregon citizen and resident of Damascus, Oregon. In September 2025, Plaintiff created a Kalshi account through the Kalshi app in Oregon using his Oregon address and bank account. Plaintiff paid money to place sports wagers on the Kalshi Platform in Oregon, and as a result wagered and lost money. Plaintiff did not know that Kalshi operated as an illegal gambling operation under Oregon law. Kalshi's advertising and representations led Plaintiff to believe that placing wagers on the Kalshi Platform was lawful in Oregon, and Defendants failed to disclose that it was not. Plaintiff's gambling losses occurred on multiple occasions within the applicable statute of limitations, while he was physically located in Oregon.

*Defendants*

47.    **Defendant Kalshi Inc.** is a Delaware corporation with its principal place of business and headquarters located at 594 Broadway Rm 407, New York City, New York 10012. Kalshi Inc. is the parent company of the Kalshi entities, including KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, and Kalshi Trading LLC. Through these subsidiaries and affiliates, Kalshi Inc. owns, controls and operates the Kalshi Platform, an online sportsbook through which persons, while located in Oregon, can place wagers on the outcome of sporting events. Kalshi Inc. also owns a trading arm (Kalshi Trading LLC) that participates on the Kalshi Platform. Kalshi monetizes wagering activity on the Platform by charging transaction fees assessed in connection

with user wagers/transactions regardless of whether the user wins or loses, thereby profiting from wagering activity. Through its ownership, control, and direction of the Kalshi Platform and its subsidiaries, and by profiting from wagers placed by members of the public, Kalshi Inc. promotes and profits from unlawful gambling and is a proprietor for whose benefit such wagering is conducted within the meaning of ORS 167.117 and 30.740.

48.    **Defendant KalshiEX LLC** ("Kalshi Exchange") is a Delaware corporation with its principal place of business and headquarters located at 594 Broadway Rm 407, New York City, New York 10012. Kalshi Exchange is a wholly owned subsidiary of Kalshi Inc. and an affiliate of Kalshi Klear LLC and Kalshi Trading LLC. Kalshi Exchange operates the Kalshi Platform and is responsible for offering, marketing, and facilitating sports wagering to users nationwide, including persons located in Oregon. Kalshi Exchange markets the Kalshi Platform to Oregon residents and accepts payments from Oregon consumers through commonly used banking, debit, and credit-card systems for the purpose of placing and settling wagers on the Platform, including transaction fees assessed in connection with those wagers/transactions. By offering, marketing, and facilitating sports wagers from members of the public as a business, and by collecting fees tied to that wagering activity, Kalshi Exchange accepts and promotes public betting on future contingent events and engages in bookmaking as defined by ORS 167.117(2)–(3). Kalshi Exchange further acts as a proprietor and operator for whose benefit such wagering is conducted within the meaning of ORS 30.740.

49.    **Defendant Kalshi Klear Inc.** is a Delaware corporation with its principal place of business and headquarters located at 594 Broadway Rm 407, New York City, New York 10012. Kalshi Klear Inc. is the parent company of Kalshi Klear LLC and exists to support the clearing, settlement, and payout functions of the Kalshi Platform, including Oregon residents. Kalshi Klear

Inc. provides and controls infrastructure integral to the financial and recording phases of the wagering enterprise and operates for the benefit of that enterprise. Kalshi Klear Inc. is therefore a proprietor, or part of the proprietorship enterprise, for purposes of ORS 30.740.

50.     **Defendant Kalshi Klear LLC** is a Delaware limited liability company with its principal place of business and headquarters located at 594 Broadway Rm 407, New York City, New York 10012. Kalshi Klear LLC is a wholly owned subsidiary of Kalshi Inc. through Kalshi Klear Inc. and is affiliated with Kalshi Exchange and Kalshi Trading LLC. Kalshi Klear LLC provides clearing, settlement, and payout functions used by the Kalshi Platform to resolve sports wagers and distribute winnings to users, including Oregon residents. Kalshi markets Kalshi Klear as a component that "accelerates" the Platform, including by enabling faster settlement and payout of wagers and supporting the expansion of sports-based wagering offerings.[12] Prior to Kalshi Klear's involvement, and since 2021, Kalshi Platform wagers were cleared by LedgerX, LLC d/b/a MIAX Derivatives Exchange on behalf of KalshiEX LLC. Personnel overlap exists between Kalshi Klear LLC and Kalshi Exchange, including employees who work for both entities. By performing wager-resolution and payout functions integral to the operation of the wagering enterprise, Kalshi Klear LLC operates for the benefit of that enterprise and is part of the proprietorship for purposes of ORS 30.740.

51.     **Defendant Kalshi Trading LLC** ("Kalshi Trading") is a Delaware limited liability company with its principal place of business and headquarters located at 594 Broadway Rm 407, New York City, New York 10012. Kalshi Trading is a wholly owned subsidiary of Kalshi Inc. and acts as an in-house institutional counterparty on the Kalshi Platform by routinely taking positions

---

[12] *Request for Transfer of Open Interest from MIAXdx to Kalshi Klear LedgerX LLC Submission 24-15* (Aug. 21, 2024), available at https://www.rothera.io/reg-notices (click Notice "24-15").

opposite those taken by users placing sports wagers, including users located in Oregon. Since at least June 28, 2021, Kalshi Trading has systematically taken the opposite side of wagers placed by members of the public on future contingent events, including sporting events. On most trading days, Kalshi Trading accounts for a substantial portion of the Platform's wagering volume. By standing ready to accept and consistently taking the other side of public wagers as a regular business practice, Kalshi Trading provides continuous liquidity and enables sports wagers to be placed and settled at scale. In doing so, Kalshi Trading accepts bets from members of the public as a business, participates in the proceeds of those wagers, and becomes entitled to receive money or other things of value when users' wagers lose. In substance and effect, Kalshi Trading operates as part of the wagering "house," enabling, sustaining and profiting from the sports-wagering enterprise conducted through the Kalshi Platform. Through this conduct, Kalshi Trading engages in bookmaking and functions as a bookmaker by unlawfully accepting bets from members of the public upon the outcomes of future contingent events, and acts as a dealer and as a proprietor for whose benefit such wagering is conducted within the meaning of Oregon law, including ORS 167.117, 167.127, and 30.740. On information and belief, Kalshi Trading shares common directors and officers with Kalshi Inc. and Kalshi Exchange.

52.    **Defendant Susquehanna International Group LLP** is a Delaware limited liability partnership with its principal place of business and headquarters located at 401 City Avenue Suite 220, Bala Cynwyd, Pennsylvania 19004. Susquehanna International Group LLP is the parent company of all Susquehanna entities. Susquehanna is one of the largest proprietary trading firms and market-making firms in the world. As relevant here, Susquehanna serves as an institutional counterparty for Kalshi on the Kalshi Platform, routinely taking positions opposite retail users' sports wagers, including wagers placed by Oregon residents. On information and

belief, Susquehanna employs proprietary quantitative models, advanced data analytics, and technological infrastructure to price and manage exposure on sports-wagering markets offered through the Platform. These tools give Susquehanna a systematic advantage over retail Kalshi users, who lack access to comparable data, models, or hedging mechanisms. Kalshi obtains significant liquidity through its partnership with Susquehanna, which routinely accepts and settles sports wagers from retail users by standing ready to take the other side of those wagers. In substance and effect, Susquehanna functions as a wagering dealer, directly accepting sports wagers from members of the public and profiting from wagering activity conducted on the Kalshi Platform. By accepting sports wagers from Oregon residents as a business and winning money or other things of value from those wagers, Susquehanna is as a dealer winning the same within the meaning of ORS 30.740, and engages in bookmaking as defined by ORS 167.117(2)–(3).

53.    **Defendant Susquehanna Government Products, LLLP** is a Delaware limited liability limited partnership with its principal place of business and headquarters located at 80 State Street, Albany, New York 12207. Susquehanna Government Products, LLLP is a member of the Susquehanna International Group of Companies ("SIG"). As announced on April 3, 2024, Susquehanna Government Products, LLLP became Kalshi's first dedicated institutional market maker on the Kalshi Platform. As relevant here, Susquehanna Government Products, LLLP serves as an institutional market maker for Kalshi, creating, buying, and selling event contracts on the Kalshi Platform. On information and belief, Susquehanna Government Products employs proprietary quantitative models, advanced data analytics, and sophisticated technological infrastructure to price event contracts tied to sports outcomes on the Kalshi Platform and manage risk, giving it a systematic advantage over Kalshi retail users. Kalshi obtains significant liquidity through its partnership with Susquehanna Government Products, which routinely takes the

opposite side of retail users' trades, thereby helping to ensure that there are always buyers and sellers available In substance and effect, Susquehanna functions as a wagering dealer, directly accepting sports wagers from members of the public and profiting from wagering activity conducted on the Kalshi Platform. By accepting sports wagers from Oregon residents as a business and winning money or other things of value from those wagers, Susquehanna is a dealer winning the same within the meaning of ORS 30.740, and engages in bookmaking as defined by ORS 167.117(2)–(3).

54.     Plaintiff is informed and believes, and on that basis alleges, that each Defendant acted in concert with, and/or under the direction and control of, the other Defendants in connection with the conduct alleged herein, and that the acts of each were authorized, directed, ratified, and undertaken for the benefit of the others. Plaintiff is further informed and believes, and on that basis alleges, that Kalshi Inc. owns and controls KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, and Kalshi Trading LLC, and that these entities operate as part of a single, integrated business enterprise with centralized control over the Kalshi Platform. On information and belief, Kalshi Inc. and its Kalshi subsidiaries share common officers and managers, coordinate operations and personnel, and share systems and infrastructure used to operate, clear, settle, and monetize wagering activity on the Kalshi Platform. To the extent applicable, the Kalshi entities function as alter egos and instrumentalities of one another with respect to the wagering enterprise described herein. Treating these Kalshi entities as wholly separate for purposes of the conduct at issue would promote injustice, elevate form over substance and permit Defendants to avoid accountability for the integrated, unlawful operation of the Kalshi Platform.

## FACTUAL ALLEGATIONS

### I.    Kalshi's So-Called "Prediction Market"

55.    Kalshi labels its Platform a "prediction market," through which users place bets on the outcome of future events, including sporting events, elections or the weather.[13]

56.    To market its sportsbook Platform as a legitimate financial exchange rather than gambling, Kalshi publicly compares itself to the New York Stock Exchange, stating:

> The NYSE and Kalshi both deal in markets, but with a key difference: what's being traded. The NYSE is a traditional stock exchange where you buy and sell shares of ownership in companies. Kalshi, on the other hand, is a prediction market. Here, you trade contracts based on whether specific events will happen, like "Will interest rates rise in the next quarter?" Think of it like predicting the future, with the price of the contracts reflecting the collective prediction of the market participants.[14]

57.    Kalshi admits that its Platform allows users to buy and sell what it calls "contracts" based "on the outcome of events."[15]

58.    Kalshi further admits that its offerings are chance-based – one of the defining hallmarks of illegal gambling.[16]

59.    To participate, users must be 18 years or older (even though Oregon law restricts sports betting to persons 21 and older) and create an account by providing "basic personal information" such as name, age, and address, and in many cases submit documents verifying the personal information presented.[17]

---

[13] https://wifpr.wharton.upenn.edu/blog/a-primer-on-prediction-markets/

[14] https://help.kalshi.com/kalshi-101/what-are-prediction-markets; *see also* Ex. 2.

[15] https://help.kalshi.com/kalshi-101/what-are-prediction-markets

[16] *Id*

[17] https://help.kalshi.com/account/signing-up/signing-up-as-an-individual; *see also* Ex. 3.

60.    When creating an account, there are no terms or conditions conspicuously linked below the registration process, nor must a user check a box acknowledging the terms and conditions.

61.    After an account is created, users must then fund their account with real money either through debit or credit card deposits, bank deposits, crypto deposits, or direct wire deposits.[18]

62.    After a user creates and funds an account, they are free to start betting on the outcome of many events, from sports to politics to pop culture.

63.    Most wagers are priced between 1 cent and $1, and bettors take a "yes" or "no" position. When the outcome of the event is resolved, winning bets receive a fixed cash payout. For example, as illustrated in Paragraph 14 above, a user may pay 74¢ for a "Yes" position on a team to win a game, which pays $1 if the team wins and $0 if it loses.

64.    Once the winners are determined, they receive a cash payout that can be withdrawn to their bank accounts or crypto wallets, among other things.[19]

## II.    Defendants Operate as Bookmakers, Providing Vital Liquidity on Kalshi

65.    Like any gambling enterprise, for Kalshi to offer sports wagering at scale (what Kalshi labels 'event contracts'), it needs sufficient liquidity.

66.    Although Kalshi contends its sports wagers are "swaps" or other peer-to-peer financial instruments, the Kalshi Platform does not function as a bilateral hedging market. Instead, to obtain that liquidity—i.e., a standing counterparty and continuously quoted prices so users can place wagers without waiting for another user—Kalshi uses and relies on institutional counterparty

---

[18] https://help.kalshi.com/transfer-funds/deposit-funds; *see also* Ex. 4.

[19] https://help.kalshi.com/transfer-funds/withdraw-funds; *see also* Ex. 5.

market makers, such as Defendants Kalshi Trading LLC, Susquehanna International Group, LLP, and Susquehanna Government Products, LLLP. The result is that Kalshi's gaming racket has a "banked house" indistinguishable from a traditional sportsbook, facilitating the continuous and smooth execution of the wagers placed by Class Members. As explained in more detail below, these market makers operate like traditional bookmakers (or "bookies").

67.      Kalshi's market makers set probabilities for future events on the Kalshi Platform by buying wagers they believe are mispriced and selling wagers they believe are overpriced.

68.      Through this structure, the Kalshi market makers effectively determine the odds and payout terms for sports wagers offered on the Kalshi Platform. By continuously standing ready to take either side of a wager, market makers ensure that users can always place a bet at terms set by the market maker's assessment of the likely outcome. This is the functional equivalent of a sportsbook setting and adjusting betting lines to manage risk and profitability, not a peer-to-peer market for exchanging financial risk.

69.      Kalshi's own website admits that its market makers play a vital role in propping up, assisting and facilitating the smooth and continuous operation of its gambling platform, which Kalshi labels a 'prediction market.'

70.      As an illustration, a market maker on Kalshi is like a carnival booth worker who always stands ready to buy or sell tickets for a game predicting whether an event will happen. Even when few other users are trading, the worker will still take your trade so you can buy a 'Yes' ticket or sell a 'No' ticket instantly. By constantly offering both sides, the worker keeps the game moving smoothly even when demand is lopsided.

71.      Kalshi's market makers operate much like the booth worker at the carnival and the "house" in a casino: they stand ready to take either side of a sports wager so that users can always

place a bet. By continuously offering both "Yes" and "No" positions on each sporting event, the market makers ensure uninterrupted wagering while controlling the payout terms (i.e., the betting odds) offered to users. In many instances, this structure allows market makers to offset opposite wagers so as to cancel out any risk, allowing market makers to substantially reduce or eliminate risk across a high volume of wagers, generating consistent profits regardless of individual sports event outcomes. This is a practice that regulators have elsewhere described as a "riskless principal" arrangement, and that is characteristic of traditional sportsbook bookmaking, not peer-to-peer trading.

72.    To obtain additional profits, market makers will choose to favor one side of the wager, providing liquidity to the market but taking on a balance-sheet risk. Should the market maker wager incorrectly, it risks losing its money. To minimize this risk, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. These sophisticated tools allow these institutional market makers to estimate future events with greater accuracy than any individual gambler on Kalshi could hope for.

73.    Additionally, Kalshi grants its designated market makers preferential financial and technological advantages not available to ordinary users. These advantages include "discounts on fees, rebates on fees, revenue share from fees, and other monetary benefits" that allow market makers to quote prices on materially different terms than retail participants. Market makers also receive enhanced technical access and proprietary risk-management protections—such as automated order-cancellation safeguards and higher messaging throughput—that allow them to manage exposure and execute trades more efficiently than non-market makers. Collectively, these preferential tools and financial incentives provide institutional market makers with structural trading advantages over ordinary users of the Kalshi Platform.

74.     Through this structure of the Kalshi Platform, institutional market makers capture the overwhelming majority of profitable opportunities available on Kalshi's sportsbook, including arbitrage opportunities arising from mispriced odds, timing asymmetries, and access to superior data and execution. As a result, and just as with any other sports gambling operation, it is nearly impossible for individual gamblers to achieve long-term profits from gambling on Kalshi, even before accounting for Kalshi's alleged "transaction fees."

75.     Independent analysis of prediction-market wagering indicates that retail users on platforms like Kalshi lose money at rates exceeding even those observed on traditional online sportsbooks. An analysis reported by *Bloomberg* and based on data compiled by Juice Reel—an independent analytics firm that tracks user wagering performance—found that, in their first three months of participation, users on prediction-market platforms lost more money per dollar wagered than users on established sportsbooks such as FanDuel and DraftKings.[20]

76.     According to that analysis, users in the bottom quartile of performance on prediction-market platforms lost approximately 28 cents for every dollar wagered, compared to roughly 11 cents per dollar on traditional sportsbooks. The analysis attributed these outsized losses not to chance or user error, but to structural features of prediction-market wagering— including institutional counterparties, pricing asymmetries, and superior execution by sophisticated traders—features that mirror, and in some respects exceed, the house advantage present in conventional sports gambling.[21]

---

[20] Denitsa Tsekova, *Kalshi Claims 'Extortion,' Then Recants in Feud Over User Losses*, Bloomberg (Feb. 4, 2026), https://www.bloomberg.com/news/articles/2026-02-04/kalshi-claims-extortion-then-recants-in-prediction-markets-gambling-feud.

[21] *Id.*

77.     Kalshi publicly disputed the findings, initially characterizing the analysis as inaccurate and improper, before later retreating from those claims.[22] Regardless of Kalshi's response, the reporting underscores that Kalshi is aware of, and sensitive to, evidence showing that its Platform systematically extracts greater losses from retail users than traditional sportsbooks—despite marketing itself as a fair, peer-to-peer alternative.

78.     Moreover, much of the apparent success among profitable gamblers can be attributed to survivorship bias, the statistical inevitability that some individuals will occasionally win given sufficient time.

79.     Similar findings have been reported for betting on other uncertain future events, including music, pop culture, and world affairs. Kalshi acknowledges these results; for example, its founder and CEO, Tarek Monsour, has noted that "Kalshi is already the most accurate forecast for federal interest rates."

80.     In all relevant aspects, the institutional counterparties on the Kalshi Platform operate exactly like traditional sportsbooks. They control the wagering terms, ensure continuous betting by standing on both sides of each wager, and profit from volume and pricing advantages. Kalshi's use of financial-market labels does not alter the economic reality that these entities function as sportsbooks for sports wagering.

81.     Like traditional sportsbooks, Kalshi's institutional counterparties generate profits by structuring wagers and payout terms so that the house retains a built-in margin across a high volume of bets. By managing opposing wagers and controlling payout spreads, these entities are able to generate consistent margins independent of the outcome of any single sporting event.

---

[22] *Id.*

82.    Also like traditional sportsbooks, Kalshi's market makers are large institutional investors with large teams, sophisticated analytical tools, and superior technological resources. They enjoy privileged status as a result of their contractual and technological integration with the Kalshi Platform, advantages that are unavailable to ordinary users.

83.    Furthermore, just as traditional sportsbooks do, Kalshi's institutional market makers will sometimes risk their own capital by committing it to one side of a wager, putting them in direct competition with individual gamblers. In those instances, the market maker is the winner or loser of the wager, just as a sportsbook is when it accepts bets directly from customers.

84.    The fact that Kalshi expresses wagering terms as percentages or implied probabilities does not distinguish its offerings from traditional sports betting. Sportsbooks routinely present odds in probability or percentage form, either directly or through readily available conversions. Expressing odds as percentages is simply another way of communicating the likelihood of an outcome and does not alter the substance of the wager.

85.    For example, if the Oregon Ducks football team was listed as a –400 favorite on a traditional sportsbook to win the national championship, that same likelihood would be expressed as an approximately 80% implied probability (often reflected as the 'Yes' side trading around $0.80). These two figures are mathematically equivalent ways of conveying the same odds, and are routinely converted back and forth by sports bettors and betting websites. Indeed, sports-betting websites encourage gamblers to understand sportsbooks' betting lines as probabilities (like the ones Kalshi uses) to assist them in calculating the expected value of a winning bet.[23]

---

[23] *See, e.g.*, Jimmy Boyd, *Money Line to Win Percentage Calculator & Conversion Table*, BoydsBets ("How to convert the odds to probabilities is a key part of understanding money line bets."), available at https://www.boydsbets.com/money-line-conversion-chart/.

86.     According to information published on Kalshi's own website, market makers account for the overwhelming majority of total spending on the Kalshi Platform. This means that when Oregon residents place a bet on Kalshi, they are almost always wagering against an institutional market maker rather than another individual user.

87.     Therefore, even though Kalshi itself formally stands between users on each wager, institutional counterparties—including Kalshi's own Kalshi Trading LLC—also function as the economic counterparties to those wagers. Because individual bettors cannot compete with the expertise, advanced analytics, and resources of these institutional market makers, they are at a structural disadvantage and lose expected value with each wager they place.

88.     The sportsbook operator and the institutional counterparty on the Kalshi Platform are not always separate entities. KalshiEX's own rules acknowledge that Kalshi Trading LLC may participate directly on the Kalshi Platform, meaning Kalshi Trading can and does place wagers against individual users, including Oregon residents.

89.     Public reports confirm that Kalshi engages in institutional wagering through its Kalshi Trading entity. In other words, Kalshi does not merely own and operate the platform on which sports wagers are placed, it also participates directly as a wagering counterparty, placing it in direct competition with its own users.

90.     By wagering directly against its users while simultaneously controlling the Platform on which those wagers take place, Kalshi positions itself as a gambling "winner" under Oregon law.

91.     Another way Kalshi acts as a gambling "winner" is by actively reaching out to users who owe money on the Kalshi Platform.[24] This conduct positions Kalshi itself as a clear winner in

---

[24] https://kalshi.com/privacy-policy (last visited Jan. 28, 2026).

the context of gambling, much like a traditional bookmaker. Rather than simply operating as a passive online technology provider, Kalshi's proactive approach to collecting debts mirrors the behavior of traditional bookmakers who pursue bettors to settle accounts or claim winnings.

92.     To provide further liquidity, Kalshi also partners with hand-selected third-party institutional market makers. The most prominent of these is Susquehanna, which in April 2024 became the first external institutional market maker authorized to wager on the Kalshi Platform.

93.     Although nominally separate legal entities, institutional market makers like Susquehanna are not financially independent of Kalshi. Rather, they are Kalshi's business partners, contracting directly with Kalshi to ensure continuous wagering on the platform. In exchange, they receive numerous financial and non-financial kickbacks and benefits. Through this coordinated arrangement and material assistance, Defendants work in concert to make and promote illegal, unconstitutional, and unregulated gambling available in Oregon.

94.     Kalshi confirms this privileged relationship with its chosen market makers on its website, acknowledging that "applicants undergo a thorough review process evaluating their financial resources, relevant experience, and overall business reputation," and "[o]nly those demonstrating exceptional qualifications are granted market maker status."

95.     Kalshi acknowledges that its institutional market makers receive special benefits, including "financial benefits" such as "discounts on fees, rebates on fees, revenue share from fees, and other monetary benefits." Kalshi further admits that these monetary incentives, along with "sophisticated risk-management tools" and technical privileges it provides, give market makers a "trading advantage" over ordinary users such as Plaintiff and Class Members.

96.     As a result of this preferential and coordinated relationship, Kalshi's institutional market makers enjoy a decided advantage over individual users like Plaintiff and Class members

when using the Kalshi Platform, ensuring that the market makers profit at the expense of others, while providing Kalshi with continuous liquidity to maintain, promote and operate its unlawful sportsbook.

97.     Because Oregon residents' wagering funds flowed to these institutional counterparties and were wagered for the benefit of Kalshi, Defendants are liable as dealers, proprietors, and winners within the meaning of ORS 30.740.

### III.     Defendants' Conduct is Illegal in Oregon

98.     Gambling is heavily regulated in Oregon and unless the legislature specifically authorizes it, gambling is unlawful. *See* ORS 167.108, *et seq*.; ORS 167.117(24) ("unlawful" means "not specifically authorized by law").

99.     And the CFTC does not override Oregon law, as the Commodities Exchange Act prohibits the CFTC from permitting "contracts" that are "contrary to the public interest" such as contracts based on "gaming." *See* 17 CFR § 40.11.

100.     Though the CFTC has not defined gaming (if the Court is even bound by the CFTC's definition), Kalshi has.

101.     For example, Kalshi admitted to the D.C. Circuit that "[t]he classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets," like those provided by Kalshi. *KalshiEX LLC, Plaintiff-Appellee, v. CCFTC, Defendant-Appellant.,* No. 24-5205, 2024 WL 4802698, at *41 (D.C. Cir. Nov. 15, 2024).

102.     Kalshi further admitted that "[e]vidently, Congress sought to prevent exchanges [like Kalshi] from facilitating casino-style or sports gambling. On a policy level, that makes some

sense: The basic purpose of Designated Contract Markets is to allow 'hedging' of economic risk."
*Id*. at *45.

103.    Kalshi even admitted that "the word 'gaming' on its face—and in accord with its legislative history—is concerned with casino gambling and sports . . .." *Id*. at *50.

104.    Kalshi has also admitted that, among other things, there are "[t]hree examples of gaming contracts: Football, horseracing, golf. They're all games. It's something that has no inherent economic significance. It's something done for amusement. It may be done purely to facilitate the betting itself for its own sake," and even "[t]he 'gaming' category reaches contracts contingent on games—for example, whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder sports gambling through the derivatives markets."[25]

105.    These admissions by Kalshi confirm that sports wagering is paradigmatic "gaming" and falls outside the scope of lawful derivatives trading.

106.    Despite these admissions, Kalshi now asserts that:

Kalshi is regulated by the Commodity Futures Trading Commission (CFTC) – an independent agency of the US government that has regulated US derivatives markets since 1974 and is overseen by Congress. Kalshi is regulated as a Designated Contract Market (DCM), which is a financial exchange designated to trade futures, swaps, and/or options on commodities.

107.    But this Court need not turn a blind eye to Kalshi's past statements.

108.    Nor does the CFTC preempt Oregon's constitutional prohibition against gambling.

109.    Kalshi's reliance on federal commodities regulation fails for an additional reason: the Commodity Exchange Act also distinguishes between contracts based on the *occurrence* of an event and wagers based on the *outcome* of an event.

---

[25]    https://www.linkedin.com/posts/daniel-wallach-a959a77_kalshis-prior-judicial-admissions-both-activity-7338273722673295360-53XG/

110.    As courts have held, Kalshi's sports wagers "turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event.'" *See North American Derivatives Exchange, Inc., v. The State of Nevada, et al*., 25-cv-00978-APG-BNW, Dkt. 105 (D. Nev.). And Kalshi has repeatedly self-certified to the CFTC that settlement and payout of its sports wagers are determined by the *outcome* of live sporting events, as defined by specified win-loss results or other game outcomes identified in its rules and certifications.

111.    On the one hand, Kalshi has admitted that derivatives regulation does not permit sports wagering. *See* ¶¶ 101-105, *supra*. On the other, Kalshi repeatedly admits that its sports offerings are based entirely on the outcome of the sporting event. *See infra*.

112.    In explaining how its sports wagering operates, Kalshi admits that users place wagers based on the *outcome of events*, stating that it operates as a platform "where you can buy and sell contracts on the outcome of events."[26]

113.    Kalshi further admits that each sports wager has its own "rules summary available that provides clarity by detailing the specific *outcomes* required for a strike to be successful. It elaborates on the conditions under which an *outcome* would meet the necessary criteria for a strike to win."[27]

114.    Kalshi also admits that settlement of its wagers depends on third-party sources "for determining outcomes" of the underlying event.[28]

115.    Kalshi's formal self-certifications to the CFTC confirm this outcome-based structure. For example, when it self-certified its "Football Stats" offering, Kalshi represented that payout occurs only when specified outcomes occur in identified sporting events, as defined by the

---

[26] https://help.kalshi.com/kalshi-101/what-are-prediction-markets

[27] https://help.kalshi.com/markets/markets-101/market-rules; Ex. 6.

[28] https://help.kalshi.com/markets/markets-101/market-rules/rules-summary

contract's payout criteria: "The Payout Criterion for the Contract encompasses the Expiration Values where <outcomes> occur in the specified <events>."[29]

116.    Another Kalshi self-certification concerning NCAA Football confirms that settlement and payout are "based on the outcome of a recurrent event," further demonstrating that Kalshi's sports offerings are resolved by game results rather than by the occurrence of any external economic condition.[30]

117.    Consistent with these admissions, Kalshi markets its Platform to the public as allowing users to wager "directly on sports, politics, economics, weather, AI, and other *outcomes* that shape their lives" and it lets "you trade on real-world *outcomes* that matter to you using simple yes-or-no questions."[31] These admissions and marketing representations by Kalshi reinforce that its offerings are wagers on event results, not instruments for hedging or managing economic risk.

118.    While trying to build trust in its Platform, Kalshi represents that it "operates as a neutral exchange platform, emphasizing its impartiality in event outcomes."[32] This representation reinforces that Kalshi's offerings are structured and settled by reference to event outcomes—i.e., win/lose results and other outcome criteria—rather than by reference to hedging economic risk.

119.    Kalshi's own employment hiring materials reflect its own understanding that it is operating a sportsbook-style wagering platform that requires sportsbook-style listing, determination, and settlement. On or about October 29, 2025, Kalshi publicly posted a job opening for "Sports Operations" seeking a candidate with "extensive experience with sportsbooks -- understanding how sportsbooks operate, common market types, settlement procedures, and the

---

[29] https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf; *see also* Ex. 7.

[30] https://kalshi-public-docs.s3.amazonaws.com/contract_terms/NCAAFGAME.pdf

[31] https://kalshi.com/careers (emphasis added); *see also* Ex. 8.

[32] https://help.kalshi.com/kalshi-101/how-does-kalshi-make-money; *see also* Ex. 9.

edge cases that arise in sports market operations." After the posting drew public attention, Kalshi modified the description.

120.    To resolve any doubt (if there was ever any), until recently Kalshi explicitly marketed itself to consumers as a sports-betting platform. On social media and in paid advertisements, Kalshi notoriously advertised itself as "The First Nationwide Legal Sports Betting Platform", encouraged users to "Bet on football legally with Kalshi," and proclaimed that "You can now bet on sports in all 50 states with Kalshi."[33]



---







121.    Kalshi also advertised within the ESPN mobile application using the slogan "PUT

$ ON YOUR TEAM," directly encouraging users to place money on sporting events.



122.    Kalshi's mobile application was promoted through the Apple App Store and Google Play Store under the banner "Kalshi: Bet on the headlines," and appeared in search results emphasizing its betting functionality.





Google Play
https://play.google.com › store › apps › datasafety › id=c... ⋮

Kalshi: Bet on the headlines - Apps on Google Play

Here's more information the developer has provided about the kinds of data this app may collect and share, and security practices the app may follow.

123.    While Kalshi may no longer publicly proclaim it operates "The First Nationwide Legal Sports Betting Platform" or that "You can now bet on sports in all 50 states with Kalshi," it has never changed its underlying business model, self-certifications, or wagering mechanics. As a result, Kalshi continues to offer sports betting, which is illegal in Oregon.

## IV.    <u>Defendants Cause Injury in Oregon</u>

124.    Kalshi has become one of the largest online gambling platforms in the United States. Within the first five months after Kalshi began offering sports-event wagers, users placed more than $1 billion across millions of individual sports propositions. More recent public reporting reflects that more than $2 billion per week is wagered on sports outcomes on the Kalshi Platform, and that Kalshi set a single-day volume record of over $1 billion on February 8, 2026 (Super Bowl Sunday). Sports betting accounts for the vast majority of Kalshi's revenue. As of February 2026, Kalshi's annualized revenues from sports wagers accounted for 90% of all fees on the Kalshi Platform, with 85% of all Platform wagers now relating to sports.[34]

125.    Kalshi, which operates its Platform in all 50 states, is estimated to have 5.1 million monthly active users as of February 2026.[35]

---

[34] Stephanie Stacey and Sam Learner, *Prediction markets take a bigger bite of US sports gambling pie*, Financial Times (Feb. 13, 2026), https://www.ft.com/content/1aa7d6a6-9bb8-44cd-83c6-9190d4b562f4?.

[35] *Id.*

126.    Kalshi prominently advertises that its sports-wagering platform operates in all 50 states, including Oregon.

127.    Oregon permits online sports wagering only through the Oregon Lottery's partnership with DraftKings and limits participation to persons 21 years of age or older. Kalshi, by contrast, allows individuals who are only 18 to open accounts and place sports wagers, placing its operations outside Oregon's regulated and age-restricted gambling framework.

128.    Many Oregon citizens have enrolled, participated, and wagered money or other things of value on sporting events through the Kalshi Platform. A great many of them are high school or college students or young adults.

129.    Kalshi's own affiliated trading arm (Kalshi Trading LLC) and its institutional counterparties (including Susquehanna) act as market makers on the Kalshi Platform by regularly taking the opposite side of users' sports wagers and profiting from those wagers placed by Oregon residents. In addition, Kalshi monetizes each wager by charging transaction fees in connection with the placement and settlement of bets, ensuring that the Kalshi enterprise profits from wagering volume regardless of the outcome of any particular sporting event. These institutional counterparties also receive contractual and technological "trading advantages"—including fee discounts, enhanced access, and proprietary risk-management tools—that are not available to ordinary users, further tilting wagering activity in favor of the house and against Oregon bettors.

## V.    Kalshi Preys on Young and Vulnerable Oregon Citizens

130.    Kalshi is fueling a pandemic of online gambling addiction. As one recent article noted, prediction markets like Kalshi "blur the already hazy line between betting and other financial activities," as "the ability to place one bet after another" on those platforms "encourages

a hallmark behavior of problem gamblers – when deep in the red, instead of walking away, they bet bigger."

131.    A study from the University of California San Diego found sports betting affects lower-income consumers, who spend as much as 10% of their income on gambling.[36]

132.    That same study found that 96% of gamblers lose money gambling, whereas only 4% made money from online betting.

133.    Problem gambling is especially common among young sports betters, who Kalshi targets. Per one study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily, including Oregon citizens.

134.    Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling – including Oregon citizens.

135.    These addictions can prove financially ruinous. And the habit takes a severe emotional toll, as, of the gamblers who actually sought treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts."

136.    Kalshi targets young adults and minors in its advertising, including enlisting an army of "Ambassadors" on college campuses to help promote its website.[37]

137.    Kalshi also partners with popular social media accounts to promote its products. Young adults and minors are the primary audience for these social media accounts.

---

[36]https://today.ucsd.edu/story/legalized-gambling-increases-irresponsible-betting-behavior-especially-among-low-income-populations

[37] https://gamblingharm.org/kalshi-college-ambassadors-program/

## CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the

Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

139.    Plaintiff seeks to represent the following Class:

All persons who, while located in Oregon, paid money or other things of value to
wager on one or more sporting events on the Kalshi Platform.

140.    Excluded from the Class are Defendants and any of their members, affiliates,

parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers,

and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the

right to modify or amend the Class definition, as appropriate, during the course of this litigation.

141.    This action has been brought and may properly be maintained on behalf of the Class

proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

142.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**.  The members of the

Class are so numerous and geographically dispersed that individual joinder of all class members

is impracticable. While Plaintiff is informed and believes that there are hundreds to thousands of

members of the Class, the precise number of Class Members is unknown to Plaintiff but may be

ascertained from Defendants' books and records. Class Members may be notified of the pendency

of this action by recognized, Court-approved notice dissemination methods, which may include

U.S. Mail, electronic mail, Internet postings, and/or published notice.

143.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2)**

**and 23(b)(3)**.  This action involves common questions of law and fact, which predominate over

any questions affecting individual Class members, including, without limitation:

a.    Whether Defendants engaged in the conduct alleged herein;

b.      Whether Defendants' alleged conduct violates applicable law;

c.     Whether services on the Kalshi Platform are illegal gambling in Oregon;

d.     Whether Plaintiff and Class members wagered money or other things value on the Kalshi Platform in Oregon;

e.     The amount of money or other things of value wagered by Plaintiff and Class members in Oregon;

f.     Whether Defendants engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Oregon;

g.     Whether Defendants' unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Oregon were likely to deceive Class members;

h.     Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

i.     The amount and nature of relief to be awarded to Plaintiff and the other Class members.

144.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class members paid money or other things of value on the Kalshi Platform while located in Oregon. Also, neither Plaintiff nor the other Class Members would have participated on the Kalshi Platform had Defendants not engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

145.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

146.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

147.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

148.    **Ascertainability –** Kalshi maintains a robust database with all its participants. Each participant must create an account to participate and must select and verify which state they are from. Kalshi also assigns each participant's account an individually identifiable number.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Declaratory Judgment
### (28 U.S.C. §§ 2201 *et seq.*)

149.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

150.    Plaintiff brings this count individually and on behalf of all other Class members.

151.    Oregon law strictly regulates and prohibits most forms of gambling, including sports wagering.

152.    Under Oregon law, unless the legislature specifically authorizes it, gambling is unlawful. *See* ORS 167.117(24) ("unlawful" means "not specifically authorized by law").

153.    Under Oregon law, "gambling" occurs when "a person stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under the control or influence of the person, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." ORS 167.117(7).

154.    A contest or event constitutes a game of chance under Oregon law when chance predominates over skill in determining the outcome.

155.    Defendants operate an online sports-wagering platform accessible through a website and mobile application (the "Kalshi Platform") that offers and facilitates sports wagering in which participants risk money or other things of value on the outcome of sporting events for the opportunity to receive a cash payout.

156.     The sports wagers offered through the Kalshi Platform are contests of chance under Oregon law. Individual users do not control or influence the outcome of sporting events, which are determined by factors outside the bettor's control.

157.     The cash payouts offered to winning users on the Kalshi Platform constitute "things of value" under Oregon law.

158.     Defendants' conduct constitutes illegal gambling under Oregon law. A gambling scheme is unlawful in Oregon regardless of the terminology used to describe it or the regulatory label Defendants claim applies. A gambling operation does not escape illegality merely by recharacterizing wagers as financial instruments, exchanges, or markets. *See State v. Langan*, 293 Or. 654, 657 (1982) (rejecting attempts to evade gambling prohibitions through formalistic distinctions).

159.     Oregon law defines "bookmaking" as promoting gambling by unlawfully accepting bets from members of the public as a business on the outcomes of future contingent events. ORS 167.117(3). As alleged herein, Defendants, acting as operators and/or institutional counterparties, (a) offer, solicit, accept, and facilitate sports wagers from Oregon residents as a business; (b) control or materially participate in the pricing, terms, and settlement of those wagers; and (c) profit from wagering activity conducted through the Kalshi Platform.

160.     In operating the Kalshi Platform, Defendants necessarily create, maintain, and use electronic records commonly used in the operation and promotion of a bookmaking enterprise, including wager confirmations, position histories, settlement records, and payout records. Oregon law recognizes such records as characteristic of bookmaking operations. *See* ORS 167.132; ORS 167.137. In addition, Kalshi monetizes wagering activity by assessing transaction fees and related charges in connection with users' wagers, and institutional counterparties profit from the spread,

pricing, and settlement of wagers they take against retail users. This conduct reflects and constitutes bookmaking under Oregon law.

161. Plaintiff and Class members each paid money or other things of value to Defendants by placing sports wagers on the Kalshi Platform for the purpose of winning cash payouts based on the outcome of sporting events.

162. Defendants accepted payments from Oregon residents—including via debit cards, credit cards, and bank transfers—for the purpose of placing sports wagers through the Kalshi Platform, and assessed transaction fees and related charges in connection with those wagers.

163. An actual and justiciable controversy exists between Plaintiff and Defendants regarding the legality of Defendants' sports-wagering operations in Oregon. Plaintiff and Class members seek a declaration that (1) Defendants' operation of the Kalshi Platform constitutes illegal gambling under Oregon law for purposes of civil remedies available to Plaintiff and the Class; and (2) any purported authority under which Defendants claim to offer sports wagering in Oregon is invalid, inapplicable, or unconstitutional as applied to Defendants' conduct.

164. Plaintiff and the Class further seek a permanent injunction enjoining Defendants from offering, facilitating, or profiting from sports wagering in Oregon, and an order requiring disgorgement of all profits derived from Oregon residents.

165. Pursuant to Federal Rule of Civil Procedure 57, Plaintiff and Class members seek a prompt declaratory-judgment hearing to resolve these questions of law and to prevent ongoing and continuing harm.

///

## SECOND CAUSE OF ACTION

### Oregon Gambling Loss Recovery Statute
### (Oregon Revised Statutes § 3763.02, *et seq.*)

166.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

167.    Plaintiff brings this count individually and on behalf of all other Class members.

168.    Plaintiff and Class members are Oregon residents who, while located in Oregon, paid and lost money or other things of value by placing sports wagers through the Kalshi Platform, or are the spouses, children, or next of kin of Oregon residents who did so.

169.    Oregon law prohibits gambling that is not specifically authorized by law. ORS 167.117(7), (24); ORS 167.127. Sports wagering offered outside the Oregon Lottery's authorized framework is unlawful.

170.    Under Oregon law, gambling occurs when a person stakes or risks something of value on the outcome of a future contingent event not under the person's control, upon an agreement or understanding that someone will receive something of value upon a certain outcome. ORS 167.117(7).

171.    As alleged herein, Defendants operate and participate in an unlawful sports-wagering enterprise accessible in Oregon by offering, facilitating, accepting, settling, and profiting from wagers on the outcomes of sporting events.

172.    Defendants' conduct constitutes unlawful gambling and bookmaking under Oregon law, including promoting and profiting from unlawful gambling in violation of ORS 167.127 and unlawfully accepting and facilitating sports wagers from members of the public as a business. ORS 167.117(3). Kalshi further monetizes wagering activity by assessing transaction fees and related charges in connection with users' wagers, and institutional counterparties profit from wagering

43

spreads, pricing, and settlement, which is conduct consistent with acting as "bookmakers" under ORS 167.117(2).

173.    ORS 30.740 provides a losing gambler with a first-party cause of action to recover twice the amount of any losses suffered. The statute provides, in relevant part:

> All persons losing money or anything of value at or on any unlawful game described in ORS 167.117 and 167.127 shall have a cause of action to recover from the dealer winning the same, or the proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost.

174.    Defendant Kalshi Inc. and Defendant KalshiEX LLC are proprietors for whose benefit the unlawful sports wagers on the Kalshi Platform were offered, accepted, and settled, and through which Defendants derived revenue and profit.

175.    Defendant Kalshi Klear Inc. and Defendant Kalshi Klear LLC are part of the enterprise that operates and monetizes the Kalshi Platform. Through clearing, settlement, and payout functions integral to completing wagers and distributing winnings and losses, Kalshi Klear performs core operational work by which the unlawful wagers are "played or dealt," and operates for the benefit of the wagering enterprise. Accordingly, Kalshi Klear is a proprietor, or part of the proprietorship enterprise, for whose benefit the unlawful wagering is conducted within the meaning of ORS 30.740.

176.    Defendant Kalshi Trading LLC, Defendant Susquehanna International Group LLP, and Defendant Susquehanna Government Products, LLLP acted as dealers and/or winners by routinely accepting sports wagers from Oregon residents as counterparties and winning money or other things of value from those wagers.

177.    Plaintiff and Class members each paid and lost money or other things of value on unlawful sports wagers placed through the Kalshi Platform.

178.    Accordingly, Plaintiff and Class members are entitled to recover twice the amount of their gambling losses pursuant to ORS 30.740, together with pre- and post-judgment interest.

179.    Plaintiff also brings this claim on behalf of the spouses, children, and next of kin of Oregon residents who paid and lost money or other things of value on unlawful sports wagers through the Kalshi Platform.

## THIRD CAUSE OF ACTION

### Violations of the Unlawful Trade Practices Act
### (Oregon Revised Statutes § 646.605, *et seq.*)

180.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

181.    Plaintiff brings this count individually and on behalf of all other Class members.

182.    Defendants, Plaintiff, and Class members are "persons" within the meaning of ORS 646.605(4).

183.    Defendants offered and sold goods or services within the meaning of ORS 646.605(6)(a), including facilitating and accepting sports wagers through the Kalshi Platform.

184.    Defendants are engaged in "trade" or "commerce" within the meaning of ORS 646.605(8).

185.    The Oregon Unlawful Trade Practices Act (UTPA), O.R.S. § 646.608(1)(u), broadly prohibits "unfair or deceptive conduct in trade or commerce."

186.    The UPTA also provides a non-exhaustive list of unlawful, unfair or deceptive conduct, including but not limited to:

    a.    Causing "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services." ORS 646.608(1)(b);

b. Causing "likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another." ORS 646.608(1)(c);

c. Representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the [] goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have." ORS 646.608(1)(e);

d. Representing that "goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the [] goods or services are of another." ORS 646.608(1)(g);

e. Advertising "goods or services with intent not to provide the [] goods or services as advertised, or with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity." ORS 646.608(1)(i); and

f. Making "any false or misleading statement about a prize, contest or promotion used to publicize a product, business or service." ORS 646.608(1)(p).

187.    As alleged herein, Defendants engaged in unfair and deceptive trade practices in violation of the UTPA through affirmative statements and marketing—on the Kalshi Platform, in advertisements, and in public-facing promotional materials—together with material omissions, concerning the nature, legality, and regulatory status of sports wagering offered to Oregon residents through the Kalshi Platform.

188.    Defendants violated the UTPA by misrepresenting or causing confusion or misunderstanding, expressly and by clear implication, that Oregon residents can "bet" on sports through the Kalshi Platform and that such sports wagering is lawful and available nationwide, including through statements and advertisements conveying that users can "bet on sports," that Kalshi operates in "all 50 states," and that sports betting on Kalshi is "legal." In reality, Defendants' sports-wagering operations are unlawful in Oregon absent specific Oregon authorization.

189.    Defendants further misrepresented that their services were of a lawful and compliant standard in Oregon by marketing Kalshi as a regulated, legitimate, and legally authorized venue for trading or betting on sports outcomes, while failing to disclose that Oregon does not authorize Defendants to offer sports wagering to Oregon residents outside the Oregon Lottery's framework.

190.    Defendants also invited and allowed participation by users age 18 and older in sports wagering through the Kalshi Platform, reinforcing the misleading impression that Defendants' sports wagering is legally compliant in Oregon, when in fact, lawful online sports wagering is restricted to adults 21 and older through the State's authorized framework—not the Kalshi Platform.

191.    Defendants further violated the UTPA by representing, implying, and failing to clearly and conspicuously disclose that participation by Oregon residents in sports wagering through the Kalshi Platform constitutes unlawful gambling in Oregon, which is an omission that was material and necessary to correct and dispel the misleading impression created by Defendants' marketing that the Platform is lawful, regulated, and permitted in Oregon.

192.    Defendants also marketed the Kalshi Platform as a "neutral exchange" that is "impartial" with respect to event outcomes. That representation was materially misleading. Kalshi monetizes wagering volume through transaction fees and operates an affiliated in-house trading arm (Kalshi Trading LLC) that participates as a counterparty to user wagers. Kalshi also grants selected institutional market makers financial and technological advantages not available to ordinary users. Defendants further fail to clearly and conspicuously disclose that these hand-selected counterparties receive significant "financial benefits" and "trading advantages," including fee discounts, rebates, revenue-sharing arrangements, enhanced throughput, and risk-management protections not afforded to retail users, including Plaintiff and Class members. These structural incentives, preferential arrangements, and undisclosed conflicts contradict the impression of neutrality conveyed to consumers and are material to reasonable users deciding whether to place wagers on the Platform. Defendants' "neutral exchange" messaging therefore conceals the sportsbook-like economic reality of Defendants' sports-wagering enterprise.

193.    Other unconscionable, false, misleading, or deceptive acts and business practices employed by Defendants include deceiving or confusing customers into believing that their gambling transactions confer or involve valid rights, remedies, or obligations (including enforceable rights to recover winnings and obligations to pay losses), when in fact such wagering transactions are unlawful in Oregon and any purported rights or obligations are materially affected by that illegality.

194.    To the extent required by law, Defendants owed a duty to disclose the illegality of sports wagering on the Kalshi Platform in Oregon because such disclosure was necessary to prevent their affirmative representations and marketing from being misleading.

195.    Defendants' unfair or deceptive acts or practices were material, were likely to deceive reasonable consumers, and did in fact deceive Plaintiff and Class members about the true approval, certification, and legality of Defendants' services.

196.    Defendants' unlawful acts and practices present a continuing risk to Plaintiff and the Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

197.    Defendants acted knowingly and willfully, with awareness of the misleading nature of their representations and omissions.

198.    Plaintiff and Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' unlawful conduct. Plaintiff and other Class members would not have participated in sports wagering through the Kalshi Platform had Defendants disclosed the true nature of the Kalshi Platform and the illegality of sports wagering to Oregon residents.

199.    Pursuant to ORS 646.605, 646.638, and 646.656, Plaintiff and the Class members seek an order enjoining Defendants' unfair and deceptive acts or practices and awarding actual or statutory damages, whichever is greater, punitive damages, restitution, reasonable attorneys' fees and costs, and any other relief that the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for judgement against Defendants and respectfully requests the Court grant the following relief:

A.  Certifying the Class, appointing Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

B.  Declaring that Defendants' operation of the Kalshi Platform constitutes illegal gambling and unlawful sports wagering under Oregon law, and that any purported authority or regulatory status Defendants claim to rely upon to offer sports wagering in Oregon is invalid, inapplicable, or unconstitutional as applied;

C.  Entering a permanent injunction enjoining Defendants, and each of them, from offering, facilitating, marketing, accepting, settling, participating in, or profiting from sports wagering or related gambling activity in Oregon through the Kalshi Platform or any similar website, mobile application, or online service;

D.  Ordering Defendants to refund and disgorge all money or other things of value lost by Plaintiff and the Class as a result of Defendants' unlawful gambling and deceptive practices, including double damages pursuant to ORS 30.740, actual damages, statutory damages, treble damages, restitution, and disgorgement pursuant to ORS 646.638 and ORS 646.656, and any other monetary relief available under Oregon law;

E.  Ordering Defendants to pay pre-judgment and post-judgment interest on all amounts awarded;

F.  Ordering Defendants to pay Plaintiff's and the Class's reasonable attorneys' fees, litigation expenses, and costs as provided by law; and

G.  Awarding such other and further legal, equitable, and injunctive relief as the Court deems just, proper, and appropriate.

///

///

///

///

50

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: February 20, 2026      **JOHNSON JOHNSON LUCAS & MIDDLETON**

*s/ Marilyn Heiken*
Marilyn A. Heiken, OSB #923308
mheiken@justicelawyers.com
975 Oak Street, Suite 1050
Eugene, OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III*
dee.miles@beasleyallen.com
James Mitchell "Mitch" Williams*
mitch.williams@beasleyallen.com
Dylan T. Martin*
dylan.martin@beasleyallen.com
Trenton H. Mann*
trent.mann@beasleyallen.com
272 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
Tel: 334/269-2343
334/954-7555 (fax)

**BLOOD HURST & O'REARDON, LLP**
Timothy G. Blood*
tblood@bholaw.com
Thomas J. O'Reardon II*
toreardon@bholaw.com
James M. Davis*
jdavis@bholaw.com
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)

**SMITH KRIVOSHEY, PC**
Joel D. Smith*
joel@skclassactions.com
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Tel: 617/377-4704
888/410-0415 (fax)

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Class*